Nathaniel SINGLETARY,
Plaintiff-Appellant,

v.

SECRETARY OF HEALTH, EDUCATION AND WELFARE,
Defendant-Appellee.

No. 970, Docket 80–6009.

United States Court of Appeals,
Second Circuit.

Argued March 26, 1980.

Decided May 13, 1980.

David Goldfarb, The Legal Aid Soc., New York City (Stuart Miller, New York City, of counsel), for plaintiff-appellant.

William M. Tendy, U.S. Atty., S. D. New York, New York City (Thomas H. Belote, Peter C. Salerno, New York City, of counsel), for defendant-appellee.

Before KAUFMAN and MESKILL, Chief Judges, and BRIEANT, District Judge.*

BRIEANT, District Judge.

We reverse the judgment below and remand to the Secretary for further proceedings consistent with this opinion.

\* Of the Southern District of New York, sitting by designation.

■ Nathaniel Singletary appeals from a judgment of the district court affirming on the administrative record, the Secretary's denial of disability benefits based on a finding that Singletary was not "disabled" within the meaning of 42 U.S.C. § 423(d)(1) on or before March 31, 1974, his last entitlement date. That finding is not supported by substantial evidence. Indeed, although the record is not as clear as it might be as to when the disability arose, the evidence of total disability in this case is overwhelming, and warrants further consideration of the issue of whether it relates back as far as 1974.

"In assessing a claim of disability, four factors are to be considered: (1) objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain and disability testified to by the claimant; and (4) the claimant's educational background, age, and work experience."

*Marcus v. Califano*, 615 F.2d 23 at 26, n. 2 (2d Cir. 1979), and cases therein cited.

Claimant, born at Kingstee, South Carolina in 1925, received an eighth grade education there. He was employed as a race track groom for at least five years, until 1969, when he stopped working, believing himself physically unfit to continue. Prior to this time he was employed at a gasoline station and a foundry.

Singletary suffers from several ailments. He has complained of dizzy spells since he was kicked in the head by a racehorse in 1969. An old leg fracture also began to cause him pain in 1969. He complains of "foot problems" which make him unable to stand or walk for significant periods. He is and has been an alcoholic, afflicted for a long time with cirrhosis of the liver.

As is usual in such cases, claimant appeared *pro se* at the administrative level, aided by his son, a non-lawyer. The Administrative Law Judge ("ALJ"), although opening the evidentiary hearing by telling claimant that "[I] will help you in every way I can to bring out the facts that have a bearing on your claim," failed, on balance, to further the remedial purposes of the Act.

The ALJ offered to get in touch with claimant's physician and in fact did so. An "attorney-advisor" to the ALJ telephoned Dr. McCollester on February 4, 1977 and ascertained that the Doctor had treated the claimant from June 1972 to August 1975 on a regular basis. Dr. McCollester diagnosed Singletary as having an alcoholic cirrhosis of the liver, which was confirmed as early as June 1972 by elevated serum globulin and bilirubin tests, weight loss, and an enlarged liver. In 1972 Dr. McCollester noted that Mr. Singletary could not work due to the chronic nature of his condition. Dr. McCollester's prognosis was that "this condition will continue to degenerate, ending in death in ten years." Peripheral neuropathy was noted for the first time in August 1975 by Dr. McCollester.

Instead of following up on this information which strongly suggested that Mr. Singletary was disabled as a result of his alcoholism as early as 1972, the ALJ discounted the Doctor's statement, finding that "[a]lthough such diagnosis [of alcoholic cirrhosis of the liver] was supported by laboratory data, the condition did not result in other end-organ damage or physical limitation. In addition, the claimant was advised many times to stop drinking, but only did so periodically."

The district court found that "Dr. McCollester's oral report leaves a suspicion that petitioner was a chronic alcoholic in 1972, but it fails to establish that fact. His conclusion that petitioner 'could not work' is ambiguous; it may only represent his report on what petitioner claimed." If there was any doubt as to the meaning of Dr. McCollester's report, a further inquiry by the ALJ was in order.

The ALJ also had before him a report from Dr. S. Courtney, a podiatrist, dated January 26, 1977, which shows that claimant "suffers from multiple foot disorders, has generalized osteoarthritis bilaterally, severe plantar and digital keratotic lesions in his feet, which make even moderate amounts of ambulation exquisitely painful." Dr. Courtney also found paresthesis secondary to alcoholic neuropathy and sever der-

matophytosis in both feet. He concluded that "in my estimation Mr. Singletary is not a good candidate for work." The ALJ should have regarded this circumlocution by Dr. Courtney as equivalent to a statement that Mr. Singletary is totally disabled, at least as of January 26, 1977, and probably for some time prior thereto. Although Mr. Singletary conceded that his foot problems were not as severe in 1974 as they are now, this condition, when considered with his other ailments, did not warrant the outright dismissal of Mr. Singletary's claim.

An examination of claimant for the Secretary by Richard Woronoff, M.D. on January 6, 1976, shows that claimant gave a case history then consistent with his present assertions. Dr. Woronoff found that claimant was then 6 feet 1 inch tall, weighing 154 lbs. with a blood pressure of 130/90. Although he found claimant normal and unremarkable in most aspects, he did confirm a tenderness of the proximal third of the shaft of the left tibia and concluded that Mr. Singletary had a liver disease, probably secondary to use of alcohol, syncopal episodes, possibly related to a post-concussion syndrome, arthralgias, and myalgias of right and left feet, and low muscle back strain.

In addition to the medical evidence, claimant testified, without contradiction, that he did not work following the race track injury because he suffered dizziness, sometimes two or three times a week, in addition to his foot condition. He said he was so dizzy he could not read the newspapers. The claimant's son attempted to testify concerning claimant's alcoholism and inability to work; however, the ALJ rejected his testimony because he is not a doctor and he is the claimant's son. While possible bias is undoubtedly a factor which would go to the *weight* of the son's testimony, the son had first hand knowledge of claimant's alcohol intake and life style. The testimony of lay witnesses has always been admissible with regard to drunkenness. Rule 701, F.R. Evid.; *People v. Eastwood*, 14 N.Y. 562, 566 (1856).

The critical date for determination of disability is March 31, 1974. The treating physician, Dr. McCollester, reported that claimant's condition between 1972 and 1975 was chronic and that "he could not work due to it." We have repeatedly stated, recently in *Eiden v. Secretary of HEW*, 616 F.2d 63 (2d Cir. 1980) and cases therein cited, that "when 'no contradictory evidence is presented, a treating physician's expert opinion is binding on the Secretary'." *Id.* at 64, quoting from *Alvarado v. Califano*, 605 F.2d 34, 35 (2d Cir. 1979) (per curiam). There is no contradictory evidence to the effect that Mr. Singletary is now able to engage in any available employment. All of the testimony is to the contrary.

Denial of benefits was premised on the narrow ground that as of March 31, 1974, the alleged impairments did not reach a level of severity to be disabling. We cannot agree that this determination is supported by "substantial evidence." 42 U.S.C. § 405(g). Chronic conditions of this sort do not arise overnight. There was competent evidence of disability at least in 1974 and 1976, and a condition which was chronic and disabling in 1975 may well have been chronic and disabling when claimant last worked. His own testimony supports this conclusion, as does the brief report of Dr. McCollester. Mr. Singletary does show a life history of hard labor performed under demanding conditions over long hours. His work record shows employment by nationally known racing stables. These animals, both trotters and pacers, are very valuable. Their care is not entrusted to malingerers or goldbricks. His prior work history justifies the inference that when he stopped working he did so for the reasons testified to.

The totality of this record would compel any fair-minded person to conclude that Singletary cannot, work, could not work, and probably will never work again. It was the intention of this remedial legislation that such persons receive the benefits provided by law.

In its review of the Secretary's determination, the district court declined to reach the applicability of the Secretary's

Regulation, 20 C.F.R. § 404.1507, denying disability where an alcoholic failed to stop drinking if instructed to do so by a physician. This was appropriate, because the ALJ's denial of benefits did not rely on the Regulation. Accordingly, we need not discuss whether alcoholism is a moral issue or a disease, a point on which there is much disagreement. Physical damage done by prior overindulgence in alcohol is a disability for purposes of the Act, and, apart from his current drinking problem, Singletary is clearly totally disabled at present.

We would remand with a direction to award benefits, except we believe there may be some difficulty in determining whether disability existed as of March 31, 1974. Accordingly, we reverse and remand to the Secretary for proceedings consistent with this opinion.

MESKILL, Circuit Judge:

I respectfully dissent. In my view both the reversal of the judgment below and the remand to the Secretary are unwarranted.

Denying statutory benefits to people in need of assistance is always an unpleasant task. The temptation to blur the distinction between individual need and statutory eligibility is strong; but our authority as judges often fails to match our sympathy for our fellow human beings. Absent constitutional transgressions, we have no more power to disregard the substantive and procedural eligibility limitations built into legislative benefit schemes than we have to change the nature and scope of the benefits themselves. It should not be otherwise. By in effect trying cases *de novo* at the district court and even court of appeals level, as the majority does here, we reduce the entire administrative process to a mere rehearsal for the actual determination, thereby ensuring that we will be seeing an ever-increasing number of these cases in the courts in the years to come.[1] Because I believe that we should confine ourselves to our proper role in social security disability cases, I dissent.

BACKGROUND

Claimant first applied for disability benefits in 1975, complaining of dizzy spells, foot problems and a knee problem. After his initial application was denied, claimant applied for reconsideration in 1976, restating his disability in the same terms. In January of 1976, before the second application was ruled upon, claimant was examined, at the request of the Social Security Administration, by Dr. Richard Woronoff. Dr. Woronoff's report indicated in pertinent part:

HISTORY

"history of being told of liver disease"

"takes only occasional alcohol now"

"faints several times a week"

"pain and aching of . . . both feet"

"no problem with standing or sitting"

PHYSICAL EXAMINATION

"in no acute or chronic distress"

"Bilirubin 1.5"

IMPRESSION

"HISTORY OF LIVER DISEASE, PROBABLY SECONDARY TO USE OF ALCOHOL. HAS ELEVATED BILIRUBIN."

"SYNCOPAL EPISODES, ETIOLOGY OF WHICH IS OBSCURE AT THIS TIME; POSSIBLY RELATED TO A POST–CONCUSSION SYNDROME."

"ANTHRALGIAS [+] MYALGIAS OF RIGHT AND LEFT FEET."

1. The only effect of the Secretary's determination is to deny Singletary payments under one particular program. Although he has been unemployed since 1969, there is no hint in the record that claimant—whose wife and son are gainfully employed—has not been adequately housed, fed, clothed, and provided with medical care, or that he has fallen through the cracks in the web of federal, state, community and private systems that serve those in need. We sometimes forget that a claimant who cannot lawfully be sheltered under a particular assistance program is not necessarily left out in the cold. Nor does denial of assistance under any particular program label an applicant a "malingerer" or a "goldbrick," as the majority seems to imply.

An x-ray report dated January 6, 1976, indicated the existence of "a completely healed, slight spindle fracture deformity" in the left leg.

After claimant's application for reconsideration was denied, a hearing *de novo* was conducted by ALJ Aaron Waldman in January of 1977, fifteen months after claimant's initial application was filed. Prior to the hearing, claimant was advised in writing to "submit all available medical evidence showing you were disabled on or before March 31, 1974." Further, claimant was advised that although he bore the responsibility for submitting evidence to support his claim, his local social security office would assist him in obtaining any additional evidence he wished to submit. Finally, claimant was advised that he could be represented by an attorney and that if he wished representation but could not afford it, his local social security office would provide a list of offices where he might be able to obtain representation. There is no claim that plaintiff cannot read or understand English.

Three medical documents were available to the ALJ at the time of the hearing. The first, Dr. Woronoff's report, has been summarized above. The second "report" was a letter from Dr. Duncan McCollester stating only that he had treated claimant from June of 1972 until August of 1975, seeing him ten times during that three year period. No diagnostic or clinical findings and no medical data of any sort were contained in this letter. The third report was that of Dr. S. Courtney, who wrote that as of January 26, 1977, claimant suffered from multiple foot disorders, rendering moderate amounts of ambulation exquisitely painful, and paresthesias secondary to alcoholic neuropathy. Although he concluded his brief report with the observation: "Mr. Singletary is not a good candidate for work," Dr. Courtney expressed no opinion, based on either the patient's history or the physical examination, as to the date of onset of claimant's foot problems. Specifically, his report was devoid of any information suggesting that these problems existed in a disabling form three years earlier, before claimant's eligibility had expired.

In addition to considering these documents, the ALJ heard the testimony of both claimant and his son. Claimant's only statement in regard to his knees at the hearing was that he had "no feelingness in them." In regard to his feet, claimant described them as calloused and painful. Both claimant and his son indicated that claimant experienced dizzy spells from one to three times per week.

After the dizziness and foot problems were discussed, the following exchange took place:

Q And was that, was that your condition back in 1974? A knee—

A That was not my condition in 1974.

Q Well I'm interested in your condition in 1974 and in the 5 years prior to that.

MR. SINGLETARY [claimant's son]: It was not as severe as that in 1974. However that was his condition. And Dr. [McCollester] would know that because he treated him for that very illness.

Immediately thereafter, following his testimony concerning his knee, claimant reaffirmed the fact that his condition in 1977 was more severe than his condition in 1974:

Q You told me about your present condition?

A Yes.

Q How does it compare with what it was in 1974?

A Well there's, it's much worse than it was in 1974.

There was also testimony by claimant's son regarding claimant's alcohol intake. Contrary to the majority's characterization, the ALJ did not "reject" the son's testimony that at certain times claimant drank heavily and that in the son's opinion claimant was a "chronic alcoholic." The ALJ merely remarked that because claimant's son was a layman and was interested in the proceedings, his observations in this regard could not be given "very much weight" and that it would be necessary to look at the reports of the various doctors who had treated and examined the claimant.

After explaining several times that claimant would have to submit reports from the various doctors who had treated him during the years of his eligibility, the ALJ stated that he would leave the record open for this purpose, inviting claimant's son to contact him if there was any problem in obtaining the required information. In addition, the ALJ volunteered to contact the doctors in question himself.

Pursuant to this offer the ALJ's attorney-advisor subsequently obtained a report from Dr. McCollester, by telephone, in February of 1977. This report stated that claimant was diagnosed in 1972 as having alcoholic cirrhosis of the liver, manifested by variable weight and an enlarged liver and confirmed by "elevated" globulin and bilirubin tests. The attorney-advisor's notes state: "His condition was noted as chronic and he could not work due to it. . . . His prognosis was that this condition will continue to degenerate, ending in death in 10 years."

No further evidence was submitted by claimant although the record was left open in order to permit him to do so. On February 28, 1977, the ALJ handed down his decision, concluding that claimant had not proved he was under a disability as of March 31, 1974.

Although the majority omits mention of the fact, this was *not* the end of the administrative process. Claimant appealed the determination of the ALJ to the Appeals Council. *Now represented by an attorney from the Legal Aid Society, claimant requested an extension for the submission of additional evidence. Although a 30-day extension was granted for this precise purpose, no additional evidence was submitted.* Therefore, the decision of the ALJ became the final decision of the Secretary in July of 1977 when the Appeals Council, in the absence of any new evidence, affirmed.

Claimant then proceeded to the district court, where he was again represented—this time by his present counsel, also an attorney with the Legal Aid Society. In June of 1979, before Judge Sofaer rendered his decision, claimant submitted two additional documents, comprising the only new evidence that he has supplied since his hearing before the ALJ. The first document is a letter from Dr. McCollester (in response to a letter received by him in *December of 1978*) in which he notifies claimant's new counsel that his files on claimant are lost or destroyed and that he "can only now write on Mr. Singletary's behalf from memory aided by the material you have provided." In this letter McCollester states that it was his opinion that claimant suffered from chronic alcoholism and that "at least as of 6/7/72, he must be regarded as unemployable." The second document is an affidavit by claimant's counsel, dated June 29, 1979, stating that he intended to make available to the court a report of Dr. Richard H. Walters, whom he had just recently succeeded in locating. According to claimant's own testimony, Dr. Walters had treated him every two weeks for about a year in 1969. Today, almost a year later, claimant has still not provided this court with Dr. Walters' reply, or with an explanation for its absence, or with a reason for believing that such a reply will be forthcoming on remand.

On this record the district court concluded that claimant had failed to carry his burden of proving disability as of his last eligibility date and that the decision of the ALJ was reasonable and based on substantial evidence. I agree.

## DISCUSSION

As to the three initial bases for a claimed disability—dizziness, knee and foot problems—to this day there has been *no* evidence that any of these symptoms reached disabling proportions prior to March 31, 1974. Despite the majority's willingness to rely on the principle that "chronic conditions of this sort do not arise overnight," claimant and his son agreed that his condition in 1974 was much less severe than it was in 1977. This evidence is uncontradicted. In view of claimant's own testimony regarding his condition in 1974 and Dr. Woronoff's report regarding claimant's condition in 1976, I am baffled by the majori-

ty's observation that the ALJ "should have" regarded Dr. Courtney's "circumlocution . . . as equivalent to a statement that Mr. Singletary is totally disabled, at least as of January 26, 1977, *and probably for some time prior thereto.*" (emphasis added).

The picture in regard to claimant's problems with alcohol is concededly less clear, but in my opinion any ambiguity is the result of claimant's belated raising of these issues and his repeated failure to come forward with evidence to support a determination of disability within the eligibility period. As I understand the law, alcohol-related problems can be disabling within the meaning of the statute in two different ways. A person may have suffered physical damage as a result of alcohol intake and if this organic damage is disabling he is clearly entitled to disability benefits. Alternatively, a claimant may be unable to control his intake of alcohol. I will assume for present purposes that this condition is also legally and medically recognized as an impairment even in the absence of physical, organic damage. But proof of either condition—organic damage or inability to control the intake of alcohol—does not alone entitle a claimant to benefits. We know that many if not most alcoholics are gainfully employed. To obtain benefits a claimant must show that he suffers from a *disabling* condition as defined by the statute. *See generally Swaim v. Califano*, 599 F.2d 1309, 1312 (4th Cir. 1979); *Adams v. Weinberger*, 548 F.2d 239, 245 (8th Cir. 1977) (and cases and regulations cited therein); *Griffis v. Weinberger*, 509 F.2d 837, 838 (9th Cir. 1975); *Fields v. Secretary of HEW*, 444 F.Supp. 1003, 1008 (S.D.N.Y.1977); *Badichek v. Secretary of HEW*, 374 F.Supp. 940 (E.D.N.Y.1974).

These fundamental distinctions have been overlooked by the majority. The first medical evidence of claimant's alcohol-related problems was contained in Dr. Woronoff's report. He stated that claimant, as of January 1976, took only occasional alcohol. Although organic damage was noted, it was not found to be disabling. Dr. Woronoff's report therefore is not evidence that claimant suffered from either type of alcohol-related disability, even two years *after* claimant's eligibility had expired.

Similarly, Dr. McCollester's telephone report referred to possible organic damage due to alcoholic intake. Putting aside that this opinion was backed up with no specific information of a clinical nature, it was clearly neither unambiguous nor uncontradicted. *Compare Eiden v. Secretary of HEW*, 616 F.2d 63 (2d Cir. 1980). Although such conditions are generally degenerative, other competent evidence established that in 1976 claimant's weight was *up*, his bilirubin count was only "high-normal," and claimant was not in acute or chronic distress. Therefore it simply cannot be said that the administrative law judge did not base his refusal to find a disability as of 1974 on substantial evidence.

I do not suggest that the record is definitive one way or the other. But claimant concedes not only that he bears the burden of establishing a disability but that we can only reverse the judgment of the district court if we determine that the Secretary's determination that he has failed to carry this burden is not supported by substantial evidence. It is therefore important to ask why the record is less than definitive. If claimant lacks the evidence to make out his case, or if claimant has unjustifiably withheld evidence from those entrusted with the duty to rule on disability claims at the administrative level, we must affirm. Significantly, the majority fails to mention the two documents submitted to the district court. These documents demonstrate that no more information can reasonably be expected to be forthcoming from either Dr. McCollester, who has lost his files and who has already expressed his opinion—based on his memory, as refreshed by claimant's counsel, of a patient he saw ten times over five years ago. Without files or records, he cannot be expected to elaborate on what he has already said. It seems equally clear that nothing is to be expected from Dr. Walters. As claimant has never suggested what evidence he hopes to submit on remand, I can only conclude that there *is* no further evidence to support claimant's posi-

**224**

tion. For this reason, a remand for reconsideration would be justified only if the newly submitted letter from Dr. McCollester, in itself, necessitated a different determination by the Secretary. From the fact that this new evidence is not mentioned by the majority, I can only assume that they agree that this is not the case.

Even if we had reason to believe that new evidence would be presented by claimant on remand, I fail to understand why the majority dispenses, without comment, with the traditional requirement that evidence be presented in a timely manner at the administrative level. In his reply brief claimant points to several deficiencies in the record he has created with the help of his son, the ALJ, and two attorneys. The only explanation offered for the failure to fill these gaps with evidence before the Appeals Board affirmed the decision of the ALJ is the statement that "neither Singletary nor his attorney was provided with a transcript of the hearing." Even assuming that a proper request was made, this explanation is irrelevant. Claimant and his attorney did not need a transcript in order to contact claimant's physicians and ask that they submit the necessary reports.

### CONCLUSION

I have no quarrel with the law as stated by the majority. For this reason I have focused on the facts, to which I believe the correct principles of law have been misapplied. This is not a case where an erroneous view of the law was applied below. *Compare Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir. 1979). Neither is it a case where there is any excuse proffered for the failure to submit pertinent evidence in a timely manner. Nor is it a case where persuasive new evidence has surfaced so as to make reconsideration a fruitful path. By ordering a remand for reconsideration in a situation where no new evidence of disability can reasonably be expected to be adduced, the majority is *sub silentio* directing the Secretary to reverse her determination. The majority's failure to so direct in explicit terms is an equally silent acknowledgment

that such a disposition is not appropriate in the case at bar. I just do not understand how this case warrants a reversal and remand. *See* 42 U.S.C. § 405(b).

I would affirm.