**Peter SCHERER, Plaintiff,**

v.

**Richard S. SCHWEIKER, Secretary of Health and Human Services of the United States, Defendant.**

**No. 81 Civ. 2289.**

United States District Court, S. D. New York.

Jan. 11, 1982.

Morrison & Hollinger, New York City, for plaintiff; Jerrietta R. Hollinger, New York City, of counsel.

John S. Martin, Jr., U. S. Atty., S.D.N.Y., New York City, for defendant; Leslie R. Bennett, Asst. U. S. Atty., New York City, of counsel.

## OPINION

EDWARD WEINFELD, District Judge.

This is an action to review a final determination of the defendant, the Secretary of Health and Human Services of the United States ("Secretary") which denied plaintiff's application for a period of disability, and disability insurance benefits and Supplemental Security Income ("SSI") based on disability under the Social Security Act, as amended (the "Act").[1] The Secretary moves for an order pursuant to Rule 12(c) of the Federal Rules of Civil Procedure granting judgment on the pleadings and plaintiff cross-moves for summary judgment pursuant to Rule 56.

---

1. 42 U.S.C. §§ 405(g), 1383(c)(3) (1974 & Supp. 1981).

The basic issue before the Secretary was whether plaintiff [2] was disabled within the meaning of the Act, that is, (1) whether he was unable to perform substantial gainful work due to a medically determinable physical or mental impairment which lasted or could be expected to last for a continuous period of at least twelve months and was so severe that it prevented him from working not only in his usual occupation, but in any other substantial gainful work considering his age, education, training, and work experience; [3] and (2) that such impairment resulted from one or more designated abnormalities supported by acceptable clinical and laboratory techniques [4] at the time he met the requirements of the Act. The issues to be determined by this Court are whether the Secretary's determination that plaintiff was not under such disability is supported by substantial evidence contained in the record as a whole and, as alleged in the complaint, whether plaintiff was unduly prejudiced because he was not represented by counsel during the administrative proceedings.

█ In reviewing the administrative record, the Court neither substitutes its judgment for the Secretary nor acts as a "rubber stamp"; [5] rather it makes a searching inquiry to determine if the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." [6] In doing so, the Court considers objective medical facts, diagnoses or medical opinion based thereon, subjective evidence of pain or disability testified to by the claimant or others, and the claimant's educational background, age, and work experience.[7]

*Personal and Employment History*

The deceased's claim for disability and SSI benefits alleged "cerebral defect, prolapsed nerve and possibly epilepsy." It centered principally about a drinking problem. As his own complaint in this action alleges, his impairments included "alcoholism, repeated bouts." Following the filing and denial of his application for benefits, upon his request, a hearing was conducted before the administrative law judge ("ALJ"). The claimant was then 39 years of age, a college graduate who had majored in economics and mathematics and received an AB degree. Thereafter, he took post-graduate courses at McGill University, Canada, where he studied philosophy and theology. His initial employment was by *The Daily News* from 1964–75 as an executive in its Advertising and Sales Department. His assignments included marketing and feasibility statistics, public relations, economic forecasting, executive sales, and presentations. He was discharged because of his alcoholism.

In 1975 and 1976, he either received welfare payments or he was self-employed doing patent investigations, market merchandising, and economic forecasting. In late 1978 and October 1979, he wrote organizational charts for a company. Commencing about June 15, 1980, he worked for a securi-

2. Since the commencement of this action, the attorneys for the plaintiff on October 31, 1981 filed pursuant to Rule 25(a)(1) of the Federal Rules of Civil Procedure notice of the death of plaintiff during the pendency of this action, but to date no substitution has been entered.

3. The term "disability" has essentially the same meaning for both the disability insurance benefits under 42 U.S.C. § 423(d) and the SSI program under 42 U.S.C. § 1382c(a)(3)(B). Consequently, since the standard of judicial review is also identical, cases under both sections are cited interchangeably. *See Hankerson v. Harris*, 636 F.2d 893, 895 n.2 (2d Cir. 1980).

4. 42 U.S.C. §§ 423(d)(1), (3), 1382c(a)(3)(C) (1974 & Supp.1981); *see also Parker v. Harris*,

626 F.2d 225 (2d Cir. 1980); *Phillips v. Department of HEW*, 453 F.Supp. 1047 (S.D.N.Y. 1978).

5. *Correa v. Secretary of HHS*, 501 F.Supp. 236, 237 (S.D.N.Y.1980); *Martin v. Secretary of HEW*, 492 F.Supp. 459, 461 (D.Wyo.1980).

6. *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938)).

7. *Singletary v. Secretary of HEW*, 623 F.2d 217, 218 (2d Cir. 1980); *Bastien v. Califano*, 572 F.2d 908, 912 (2d Cir. 1978).

ty protection firm as an unarmed guard. His first assignment was from June 15 to July 23, 1980 at a New York Telephone Company building where he checked identification cards and passes of persons entering the building. The hours were from 7:00 a.m. to 4:00 p.m., five days a week, and 12-hour shifts on Saturdays and Sundays. His duties included sitting at a desk, receiving messengers and checking identification cards and occasional patrolling. That assignment was interrupted when for several weeks he worked as a market consultant in which capacity he investigated certain anti-burglary devices but quit because of low wages. He then resumed his work as a security guard at a New York Telephone Company building, but at a different location. His workday was eight hours. His duties required him to check identification cards and receive messengers, which permitted him to sit at a desk while performing these duties. His work there also included walking through the main corridors, checking fire station doors, the stairwells, other major areas, fire and burglary alarm systems. At the time of the hearing on August 12, 1980, he was so employed and testified that he planned to resume his regular work the next day during his usual hours from 7:00 a.m. to 4:00 p.m.

## Medical History

The evidence, in addition to the plaintiff's testimony, consisted of records of various hospitals at which he had received treatment starting with St. Luke's Hospital where he was admitted on January 29, 1976 to the Detoxification Unit. On the evening of his admission, it was noted that he had a grand mal seizure with generalized movements of all extremities and transient loss of consciousness. He was transferred to the medical service where he was treated for acute alcoholic withdrawal and delirium tremens. The diagnosis upon his discharge on February 21 was alcohol abuse, Staph. septicemia, and fracture of a rib. He was again admitted to St. Luke's Hospital on May 7, 1976 for complaints of dizziness and tremulousness and loss of consciousness six days earlier following a fall. He had a trauma "work up" which included enchoencephalogram, electroencephalogram, brain scan and skull films, all of which proved normal. Upon discharge on May 20, 1976, the diagnosis was alcoholic encephalopathy, alcoholic myopathy, alcoholic neuropathy and fatty metamorphosis of the liver. On March 24, 1977, the plaintiff was again admitted to St. Luke's Hospital for a head trauma and remained there until April 4, 1977 during which period a craniotomy was performed. Upon his discharge, the final diagnosis was epidural hematoma, intracerebral hematoma and chronic alcoholism.

Plaintiff was admitted to Bellevue Hospital on three separate occasions from June to August 1978. On June 26 he was admitted regarding a potential cranioplasty. His neurological examination indicated he was conscious, alert, awake and oriented. He was placed on Dilantin [8] and told to return as an outpatient. On July 1, he was admitted again, after being beaten about the face and body as a result of which he lost consciousness. He was discharged on July 16 with a diagnosis of moderate head trauma, loss of consciousness with skull fracture, left clavicular fracture, and acute psychosis cleared. His third admission to Bellevue was on August 14 for a depressed cranial fracture and subdural hematoma on the right side of his head. An operation was performed and a silastic implant inserted to correct the defect of the right skull. He was discharged after a week.

His next hospitalization was at St. Clare's Hospital from June 9 to June 13, 1979 for a laceration of his right hand. Thereafter he was confined at the Smithers Alcoholism Center Rehabilitation Unit for treatment after a four-year history of alcoholism during which period he had been detoxified three times. The diagnosis upon discharge was chronic alcoholism and status post-repair of the tendons of the right forearm.

8. "[U]sed as an anticonvulsant in grand mal epilepsy." Dorland's Illustrated Medical Dictionary (25 ed. 1974).

In November 1979, Dr. Francisco Perada, a neurologist, conducted an examination and made an evaluation of the claimant. Dr. Perada reported that the claimant had said he had seizures since 1964, off and on, but described only two seizures in the five months prior to the examination and that upon taking Dilantin three times a day, his condition had improved. The neurologist's diagnosis was seizure disorder after head concussion. He found the claimant was alert, his state of awareness, consciousness and responsiveness were normal and that his general intellectual level was normal. The total neurological examination and electroencephalogram were normal.

The final medical report in evidence was that of Dr. Van Uitert dated March 11, 1980. He reported that he was currently treating the claimant for major motor seizure disorder; that he then was on very large doses of Dilantin "which has completely controlled his problem." The doctor further reported that the claimant had not had a seizure during the six or seven months he had been treating him; that the patient reported that he did not have a seizure for at least a year; and that the large doses of Dilantin have had no residual effect on the patient's activities. The doctor stated that the only limitations he would place on his patient "are those that would be placed on any patient with epilepsy, such as not swimming alone or not working around machinery."

While the medical history of plaintiff's treatment for alcoholism and traumatic injuries extended over a substantial period (as computed by his counsel, it covered 124 days from January 1976 to August 1979, with follow-ups on at least 19 occasions) that, by itself, does not establish plaintiff's claim. The issue remains whether the claimant was under such disability as defined by the Act as to entitle him to disability payments. The Act provides that a claimant

shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity

that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.[9]

The ALJ, based upon the totality of the evidence including the demeanor of the plaintiff, found that he was employed as a security guard at the time of the August 12, 1980 hearing and had been so employed since June 15, 1980; that he sits at a desk and occasionally patrols; that at his first guard position he had to stand 9 to 10 hours a day, which he did not find too difficult; that he had no problem walking or sitting; that he could lift 40–50 lbs. but not continuously; that he exercised by walking briskly three miles each day. He further found that the claimant's complaint of a humming sensation in the ear that caused him to have sleeping problems, did not interfere with his work. With respect to his complaint that occasionally his eyes would get blurry, a condition that manifested itself before he took Dilantin, the ALJ found that this condition did not prevent the claimant from reading the marketing news in *The New York Times, The Wall Street Journal, The Daily News* and the *New York Post*, and that it did not impair his ability to work. Another subjective complaint by the claimant was of stiffness in his right hand which was injured when he fell, upon which surgery was performed. While the hand was somewhat stiff and unsightly, he had no difficulty in grasping things.

The ALJ also noted that the claimant's alcohol abuse problem had not prevented him from working in 1976, 1978, 1979, and at the time of the hearing in 1980. Based upon the claimant's testimony, the ALJ found that the claimant (1) was no longer addicted to alcohol; (2) had the ability to refrain from drinking alcohol; and (3) was capable of working.

---

**9.** 42 U.S.C. § 423(d)(2)(A) (1974 & Supp.1981).

He further found that there was no objective medical evidence that the claimant's alcoholism, since its alleged onset in January 1977, had prevented him from working and that the head and other injuries for which he received treatment did not establish the existence of a severe impairment or combination of impairments; that to the contrary, his impairments were very mild and not in any way restrictive. His comprehensive finding was that the claimant was able to and in fact was engaged in substantial gainful activity and he was not under a disability as defined in the Social Security Act or the regulations promulgated thereunder.[10]

 It is recognized that alcoholism alone or the inability to control the intake of liquor may render one disabled, "if the disease progresses to the point where there is recognizable mental or physical deterioration" as a result of which, he is unable to engage in any gainful activity.[11] However, in this instance one does not have to rely upon a hypothetical opinion of an expert as to claimant's substantial work capacity; that capacity was and had been in existence for sometime prior to the hearing. While it is true that the claimant's drinking habits caused the loss of his job as a newspaper executive which gave scope to his talents and his earning capacity as a college graduate, and that his job as a security guard clearly was less desirable, nonetheless, the fact is that the claimant was able to engage in substantial and remunerative activity as defined in the Act. His earnings as a security guard of $165 to $175 net per week were in excess of the $300 per month guideline.[12] And although this was less than that which he had earned as a newspaperman, and could have earned as a person of sobriety,

again the undeniable fact is that he was engaged in substantial and gainful activity. The Social Security Act does not require payments to a claimant for an impairment of his earning capacity. The regulations specifically provide it is immaterial that a claimant's work may be less responsible or less remunerative than his previous work.[13]

This Court's "searching investigation"[14] and its word-by-word reading of the record, including the transcript of the testimony and the exhibits, compel the conclusions that not only are the findings of the ALJ abundantly supported by substantial evidence but any other findings would fly in the face of overwhelming evidence that claimant had not established his claim for disability benefits.

As to the claim that plaintiff's *pro se* appearance unduly prejudiced him, this Court's study of his testimony at the hearing and the entire administrative record indicates that it is a mere allegation, without evidentiary support. The record establishes that he had been advised of his right to counsel; that he understood his rights; that he decided to proceed *pro se*. Further, he answered all questions responsively and was a vigorous advocate of his claim.

The motion by the Secretary to dismiss the complaint is granted; the motion of the plaintiff is denied. Judgment may be entered accordingly. So ordered.

---

10. *See* 20 C.F.R. §§ 404.1504(a), 416.904(a) (1980).

11. *Fields v. Secretary of HEW*, 444 F.Supp. 1003, 1008 (S.D.N.Y.1977); *see Singletary v. Secretary of HEW*, 623 F.2d 217, 220, 223 (2d Cir. 1980) (majority and dissenting opinions); *Swaim v. Califano*, 599 F.2d 1309 (4th Cir. 1979); *Adams v. Weinberger*, 548 F.2d 239, 245 (8th Cir. 1977); *Badichek v. Secretary of HEW*, 374 F.Supp. 940 (E.D.N.Y.1974).

12. 20 C.F.R. § 416.934(b)(1) (1980).

13. 20 C.F.R. §§ 404.1532, 416.934 (1980).

14. *Gold v. Secretary of HEW*, 463 F.2d 38, 43 (2d Cir. 1972) (quoting *Miracle v. Celebrezze*, 351 F.2d 361, 382–83 (6th Cir. 1965)).